## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DEBORAH LAUFER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | **Civil No. 20-cv-03251-SAG** |
| | * | |
| **AKSHAR CORPORATION,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### ORDER

The Court recently issued a decision in *Laufer v. Naranda Hotels, LLC*, ECF 26, SAG-20-2136, and *Laufer v. Ft. Meade Hospitality, LLC*, ECF 21, SAG-20-1974, finding that Plaintiff lacks Article III standing to bring suit and that this defect is incurable (attached as Exhibit A). Plaintiff's counsel has confirmed that this case, 20-cv-03251-SAG, is indistinguishable from *Naranda* and *Ft. Meade* insofar as the standing question is concerned. ECF 7. Therefore, for the reasons articulated in Exhibit A, it is this 28th day of December, 2020, ORDERED that Plaintiff's complaint in this case, ECF 1, is DISMISSED WITH PREJUDICE. The pending motion in this case, ECF 5, is therefore moot. The Clerk is directed to CLOSE this case.

 

 

_____/s/_____

Stephanie A. Gallagher

United States District Judge

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

<table>
<tr><td>DEBORAH LAUFER,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil No. SAG-20-2136</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>NARANDA HOTELS, LLC,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
</table>

*    *    *    *    *    *    *    *    *    *    *    *    *

<table>
<tr><td>DEBORAH LAUFER,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil No. SAG-20-1974</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>FT. MEADE HOSPITALITY, LLC,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
</table>

*    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM OPINION**

Deborah Laufer ("Plaintiff") filed a Complaint on August 17, 2020 against Naranda Hotels, LLC ("Naranda"), alleging a violation of the Americans With Disabilities Act ("ADA"). Civil No. SAG-20-2136, ECF 4. Naranda has filed a Motion to Dismiss the Complaint, contending that Plaintiff has failed to state a claim and also lacks Article III standing to sue. ECF 13. Plaintiff filed an opposition, ECF 16, and Naranda filed a reply, ECF 17.

Plaintiff also filed a nearly identical Complaint on July 3, 2020 against Ft. Meade Hospitality, LLC ("Ft. Meade"), alleging the same ADA violations. Civil No. SAG-20-1974, ECF

1. Ft. Meade failed to respond, prompting Plaintiff to move for Default Judgment.  ECF 7.  United States District Judge Paula Xinis denied the motion and dismissed the case *sua sponte* without prejudice for want of jurisdiction.  ECF 8, 9.  The case was reassigned to me, ECF 13, and Plaintiff has moved for Leave to File an Amended Complaint.  ECF 12.

This Court has carefully reviewed all of the filings in both cases and held an evidentiary hearing on December 1, 2020, at which Plaintiff testified and the parties presented legal argument on the issue of her standing.  For the reasons that follow, Naranda's motion to dismiss will be granted.  Plaintiff's motion for leave to file an amended complaint in *Ft. Meade* will be denied.

## I.       Factual and Procedural Background

Plaintiff resides in Pasco County, Florida, and requires assistive devices, often including a wheelchair, to ambulate.  ECF 4 ¶ 1 (*Naranda*).  Accordingly, she qualifies as an individual with disabilities as defined by the ADA.  *Id.*  When visiting a lodging facility, she requires accommodations including accessible handicap parking spaces, wider doorways, and amenities lowered so that she can reach them from her wheelchair.  *Id.*

Plaintiff asserts that she is a "tester" "for the purposes of asserting her civil rights and monitoring, ensuring, and determining whether places of public accommodation and their websites comply with the ADA."[1]  *Id.* ¶ 2.  Defendant Naranda owns a lodging establishment known as

---

[1] The relevant ADA standards applicable to places of public accommodation include the following:

> **Reservations made by places of lodging.**  A public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party –

Sleep Inn & Suites Downtown Inner Harbor in Baltimore, Maryland. *Id.* ¶ 3. Defendant Ft. Meade owns a lodging establishment known as Quality Inn & Suites in Laurel, Maryland. ECF 17-2 ¶ 3 (*Ft. Meade*). Online reservations for both hotels can be made at booking.com, priceline.com, agoda.com, expedia.com, www.trip.com, and orbitz.com. *Id.* ¶ 9; ECF 4 ¶ 9 (*Naranda*). Prospective customers can use those sites to review information about the properties and to reserve accommodations. *Id.*

On July 10, 11, 12, 13, and 20 of 2020, Plaintiff alleges that she "visited the websites for the purpose of reviewing and assessing the accessible features at [Naranda's] Property and ascertain [sic] whether they meet the requirements of 28 C.F.R. Section 36.302(e) and her accessibility needs." *Id.* ¶ 10. Plaintiff says that she did the same on June 20, 21, 22, 23, and 24 of 2020 for those same websites providing reservations for Ft. Meade's hotel. ECF 17-2 ¶ 10 (*Ft. Meade*). Plaintiff alleges that the websites "did not identify or allow for reservation of accessible guest rooms and did not provide sufficient information regarding accessability [sic] at the hotel[s]." *Id.* Plaintiff maintains a list of "every hotel she sues" and revisits online reservations systems before and after her complaints are filed, to see whether the systems have become compliant. *Id.* ¶ 11. Plaintiff alleges a variety of harms she has experienced, including that she "was deprived [sic] the same goods, services, features, facilities, benefits, advantages, and accommodations of the Property available to the general public," *id.* ¶ 10, "is continuously aware

---

(i) Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms;

(ii) Identify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs . . . .

28 C.F.R. § 36.302(e)(1).

that the subject websites remain non-compliant and that it would be a futile gesture to revisit the websites as long as those violations exist unless she is willing to suffer additional discrimination," *id.* ¶ 12, and "has suffered, and continues to suffer, frustration and humiliation as the result of the discriminatory conditions present at Defendant's website," *id.* ¶ 13.[2]

The Complaints use the same boilerplate language in nearly every respect except for one— their description of Plaintiff's travel plans. The proposed Amended Complaint against Ft. Meade inserts the following language that is missing in the Complaint against Naranda:

> Since prior to the inception of this lawsuit, Plaintiff had and continues to have plans to travel North as soon as the Covid travel restrictions are eased. This includes a trip from Washington, D.C., through Maryland, Pennsylvania, New Jersey, New York, Connecticut and other states. She will travel throughout the entire area. She will sightsee and visit family and will stay in hotels during her travels, including Laurel Maryland, between D.C. and Baltimore. She needs hotel online reservations systems to identify and allow for booking of accessible rooms and provide thorough and accurate information as to whether the features at the hotel are accessible so that she can make a meaningful choice in selecting her hotels and making her travel plans.

*Id.* ¶ 10. In *Naranda*, meanwhile, Plaintiff submitted a declaration in support of her opposition to the motion to dismiss in which she states that "I have plans to travel to Maryland as soon as the Covid crisis is over and it is safe to travel. I intend to travel all throughout the State, including the Baltimore area, and I need to stay in hotels when I go." ECF 16-1 at 3 (*Naranda*).

At the December 1, 2020 hearing, Plaintiff testified at length about her travel plans.[3]  *See* Recording of December 1, 2020 H'rg. As further detailed below, she testified as to her itinerary

---

[2] While the Complaint and proposed amended Complaint make reference to "Defendant's website," Plaintiff expressly testified that she did not visit the actual website for Naranda's property, but simply relied on information available on the third-party travel sites. *See* Recording of December 1, 2020 H'rg. Naranda raises that as a separate basis for dismissal of Plaintiff's claims, but this Court need not reach the question as a result of her lack of standing to sue.

[3] Because the official transcript of the evidentiary hearing was not immediately available, all quotes from and references to Plaintiff's hearing testimony come from the Court's notes and internal recording system.

for her trip to Maryland and beyond, her past and present travel plans, the logistics of how she travels, and her litigation in other states.

## II.    Legal Standards

Naranda, in its motion to dismiss, asserts that Plaintiff lacks standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Article III of the United States Constitution restricts the jurisdiction of the federal courts to actual "cases" and "controversies."  *Id.* at 559; U.S. Const. Art. III, § 2.  In other words, Article III standing exists only where "questions [are] presented in an adversary context." *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968)) (internal quotation marks omitted).  In this context, Plaintiff must have pleaded facts to plausibly establish standing, because it "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (citations omitted).

Thus, the Complaint must include allegations to plausibly establish (1) that Plaintiff "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) that her injury is "fairly traceable to the challenged action of the defendant"; and (3) that her injury is capable of redress "by a favorable decision." *Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009) (quotations omitted).  Those "separate criteria" each must be satisfied. *Griffin v. Dep't. of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019).  Importantly, standing—and thus the existence of injury in fact—is determined at the time that the complaint is filed. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 189 (2000) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (citations omitted);

*Lujan*, 504 U.S. at 570 n. 5 (1992) ("[S]tanding is to be determined as of the commencement of suit.").

The *Ft. Meade* case, meanwhile, presents in the posture of a motion for leave to amend. "Federal Rule of Civil Procedure 15(a) declares that leave to amend 'shall be freely given when justice so requires' . . . ." *Forman v. Davis*, 371 U.S.178, 182 (1962). "[L]eave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009). Where a plaintiff lacks Article III standing, it is axiomatic that any proposed amendment that fails to remedy the standing issue is futile. *DataCell ehf. v. Visa, Inc.*, No. 1:14-CV-1658GBL/TCB, 2015 WL 4624714, at *11 (E.D. Va. July 30, 2015); *see also Williams v. Lew*, 819 F.3d 466, 471 (D.C. Cir. 2016) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss."); *Treiber v. Aspen Dental Mgmt., Inc.*, 635 F. App'x 1, 4 (2d Cir. 2016). Thus, both the *Naranda* and *Ft. Meade* inquiries turn on the existence of standing to sue.

As a final point, a court deciding the adequacy of a complaint under Rule 12 must generally accept as true the complaint's factual allegations. However, "when the factual basis for a plaintiff's standing is challenged . . . it is appropriate for the Court to 'go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support [standing].'" *Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*, 631 F. Supp. 2d 702, 703 (D. Md. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In the context of repeat ADA plaintiffs specifically, at least one other court has held that "the court may conduct relevant discovery and fact finding (including findings as to [the plaintiff's] credibility)." *Harty v. Simon Prop. Grp., L.P.*, 428 F. App'x 69, 72 (2d Cir. 2011).

III.     **Analysis**

Courts in this district have had two opportunities to address Plaintiff's standing to bring claims against various hotels in the state.  In each instance, the Court, relying on the Fourth Circuit's opinion in *Griffin*, 912 F.3d at 649, concluded that Plaintiff did not have standing based on her alleged "tester" status.  *See Laufer v. Ft. Meade Hospitality, LLC*, No. 8:20-cv-1974-PX, 2020 WL 6585955, at *3 (D. Md. Nov. 10, 2020); *Laufer v. BRE/ESA P Portfolio, LLC*, No. SAG-20-1973, 2020 WL 6801924, at *2 (D. Md. Nov. 19, 2020).  While this Court does not wish to retread ground already examined at length in both previous opinions, it is important to briefly examine once again why Plaintiff's theory of standing as a "tester," without more, fails under *Griffin* and the Supreme Court precedent upon which it relied.

First, the Supreme Court has firmly established that tester status provides standing in certain circumstances, but that informational or dignitary injury alone is not *always* sufficient to satisfy Article III's requirements.  In the landmark case of *Havens Realty Corp. v. Coleman*, the Supreme Court held that testers, posing as prospective renters, have standing to sue under the Fair Housing Act when they are provided with inaccurate information.  455 U.S. 363, 373 (1982).  In a subsequent ruling, the Supreme Court held that a plaintiff's "fail[ure] to obtain information which must be publicly disclosed pursuant to a statute" is, in itself, a sufficiently "concrete and particular[ized]" injury-in-fact.  *FEC v. Akins*, 524 U.S. 11, 21 (1998).  More recently, however, the Supreme Court explained that not *all* injuries recognized by statute are sufficiently "concrete and particularized":

> Congress' role in identifying and elevating intangible harms does not mean that a
> plaintiff automatically satisfies the injury-in-fact requirement whenever a statute
> grants a person a statutory right and purports to authorize that person to sue to
> vindicate that right. Article III standing requires a concrete injury even in the
> context of a statutory violation. For that reason, Robins could not, for example,
> allege a bare procedural violation, divorced from any concrete harm, and satisfy the

7

injury-in-fact requirement of Article III . . . [However,] the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). It is, therefore, the duty of the courts to determine whether, in the context of the ADA and 28 C.F.R. § 36.302(e)(1) specifically, the "informational" and "dignitary" harms alleged are concrete enough to satisfy Article III's injury-in-fact requirement.

The Fourth Circuit has not directly addressed this question regarding § 36.302(e)(1), but in *Griffin* it did address the related question of whether tester plaintiffs have standing to sue for other website-based ADA violations. *Griffin* involved a plaintiff with visual impairments who filed suit against a credit union whose website he alleged lacked the necessary accessibility features. 912 F.3d at 656. Griffin claimed he had standing as a "tester" enforcing the ADA's accessibility requirements, and alleged both dignitary and informational injuries. *Id.* The credit union, however, was required by law to restrict its membership to employees of the Department of Labor or family members of such employees. *Id.* Griffin did not meet those membership requirements. *Id.* The Fourth Circuit affirmed the lower court's dismissal of the case for lack of Article III standing because Griffin could not legally access the credit union's services. *Id.* at 657. Thus, the Court reasoned, Griffin suffered no concrete, particular, or imminent injury, despite the alleged inaccessibility of the credit union's website. *Id.* Specifically, *Griffin* held that "dignitary" and "informational" injuries caused by a website's ADA violations are not "concrete" or "particularized" without plausible allegations that the plaintiff has some use for the website's information. *Id.* at 653-57.

Plaintiff correctly points out that the Fourth Circuit was careful to limit its holding to the facts of *Griffin* and that there is no legal impediment barring Plaintiff from reserving a room at

Defendants' hotels. Even so, *Griffin*'s underlying reasoning has unmistakable force in the context of § 36.302(e)(1). "Inability to obtain information is sufficiently concrete to constitute injury in fact *only when the information has some relevance to the litigant*."[4]  *Id.* at 654 (emphasis added). *Griffin* unequivocally disavowed any interpretation of standing doctrine that "allow[s] any aggrieved person to challenge any allegedly deficient website belonging to anyone in the country," because such an interpretation "would require us to open the courthouse doors to abstract and hypothetical controversies, in brazen violation of Supreme Court precedent." *Id.* at 657. Plaintiff's "tester" standing theory in this case exemplifies that rejected interpretation. Pure testers, by definition, have no desire to actually use the room reservation website, and the information required by § 36.302(e)(1) has no specific relevance to them beyond their generalized desire to find ADA violations and file lawsuits. The tester's alleged injuries are thus no more concrete or particularized than the injuries suffered by anyone who finds a noncompliant website while browsing the web—"any aggrieved person" sitting at a computer anywhere in the country could be a "tester" evaluating whether any lodging establishment's reservation information meets the ADA's requirements. Plaintiff's theory therefore "admits of no limiting principle" and would eviscerate Article III's standing limitations. *Id.*

Having had her tester theory rejected multiple times by this Court for violating this central tenet, Plaintiff now seeks to individualize her claims with factual allegations outlining her purported longstanding plans to travel to Maryland once the COVID-19 crisis ends. In doing so, she seeks to transform herself from a mere concerned bystander into a party with an actual or

---

[4] Even *Akins*, a high-water mark for pure informational injury standing, involved information that had an actual relevant use to those seeking it. As the Supreme Court explained, the information plaintiffs sought there would "help them . . . evaluate candidates for public office," thus making their failure to receive such information a concrete injury. 524 U.S. at 21.

imminent injury, based on the difficulties she faces in planning her trip due to Defendants' non-compliance with the ADA. There is a conclusive practical impediment to these allegations, however: the COVID-19 pandemic and Plaintiff's understandable unwillingness to expose herself to out-of-state travel while it persists. Moreover, the Court also finds Plaintiff's claims incredible based on inconsistent attestations she has made in this and other cases throughout the country. Under such circumstances, Plaintiff's proffered travel plans, and the injuries she claims to have suffered as a result, still fall short of establishing her standing to sue.

### A.  The COVID-19 Pandemic

First, Plaintiff lacks standing because she did not visit travel websites in the summer of 2020 with the intention of booking rooms in Defendant's establishments, nor did she then have concrete plans to travel to Maryland. In fact, the COVID pandemic has prevented Plaintiff from making any set travel plans to visit the state. *See* Recording of December 1, 2020 H'rg (responding "no . . . no, I haven't. COVID." when asked whether she has "made any definite plans to visit the Baltimore-D.C. area"). Plaintiff attempts to manufacture definiteness by claiming that she has long planned to travel to Maryland "as soon as the Covid crisis is over and it is safe to travel," ECF 16-1 at 3 (*Naranda*), and once "the Covid travel restrictions are eased," ECF 17-2 at 5 (*Ft. Meade*).[5] Like the rest of the world, however, Plaintiff cannot predict when the pandemic will end and safe travel will resume. *See* Recording of December 1, 2020 H'rg (responding "I don't know"

---

[5] At the December 1, 2020 hearing, she claimed for the first time that she would travel to Maryland in March 2021 barring unforeseen circumstances, but also attested numerous times at the hearing and in her filings that she would not travel until it is deemed safe to do so. *See, e.g.*, Recording of December 1, 2020 H'rg ("[A]s soon as I have a vaccine, my granddaughter has a vaccine and we can travel . . . I want to travel."). This makes her March 2021 date a mere hope, rather than a concrete plan. Per her testimony, Plaintiff is at high risk for the disease, has not traveled outside Florida since the start of the pandemic, and canceled a planned 2020 trip to Maine due to COVID. *Id.*

and "as soon as the government decides" when asked if she knows when the vaccine will be available).  While vaccines are beginning to be administered in the United States, how and when they will be distributed remains in question, preventing any reliable prediction as to the timing of widespread availability or particular availability to Plaintiff and her family members.

Essentially, the pandemic puts Plaintiff's claimed travel plans in flux indefinitely.  When she visited the room reservation websites in the summer of 2020 prior to filing these two lawsuits, she did so as a concerned bystander, rather than an individual actually seeking to use the websites to book a hotel room or to plan for an upcoming trip.  Finding standing in such a circumstance would directly contravene *Griffin*'s warning against "open[ing] the courthouse doors to abstract and hypothetical controversies."  912 F.3d at 657.  Plaintiff's alleged difficulties with the room reservation websites are purely hypothetical, because she has not made any attempt to book a room, even as of the time of her hearing testimony.  Instead, she has only stated an intent to visit Maryland at an unspecified time in the future.  *See Lujan*, 504 U.S. at 564 ("[A]ffiants' profession of an 'intent' to return . . . is simply not enough.").

Indeed, Plaintiff's future travel hopes bear a striking resemblance to those in the foundational *Lujan* case.[6]  *See* 504 U.S. at 560.  In *Lujan*, environmental groups challenged a regulation they claimed increased extinction rates for certain endangered species.  *Id.* at 562-63.  They submitted affidavits and other evidence attempting to show that the individual plaintiffs would be "directly" affected by the potential harm to these species.  *Id.*  Specifically, plaintiffs said that they planned "in the future" to return to Sri Lanka—where they feared they would be unable to see the species due to harm caused by the regulation—but could not do so currently at

---

[6] *Lujan* did not involve the ADA and the sort of Internet-based injury at issue here, so it is assuredly not directly on point.  That said, its guiding principles are instructive given the similar "some day" plans to visit Maryland articulated by Plaintiff.

least in part because of an ongoing civil war. *Id.* at 563-64. The Court deemed the injury insufficiently "actual or imminent." *Id.* Here, as in *Lujan*, Plaintiff claims plans to travel to Maryland at an unspecified future date. COVID-19, not unlike the Sri Lankan civil war, stands in the way of a definite travel itinerary. It would be a drastic departure from *Lujan* to hold, now, that Plaintiff has standing despite the inherent and admitted indeterminacy of her plans and the correlated lack of injury she can plausibly claim as a result. Moreover, even if Plaintiff now had definite future travel plans, it would not change the fact that she lacked such plans at the time she filed these two suits.

The relevant ADA provisions, by their own plain language, seek to protect individuals with disabilities who require information to make reservations at lodging establishments. *See* 28 C.F.R. § 36.302(e)(1). It is not plausible to conclude that Plaintiff was actually looking to reserve a room while browsing the Ft. Meade and Naranda reservation pages, since she had no definite plan to travel to Maryland in the first place, and certainly was making no such arrangements in the summer of 2020.[7] In fact, both Complaints specify that she visited the websites "for the purpose of reviewing and assessing the accessible features . . . and ascertain whether they meet [ADA] requirements," ECF 17-2 at 5 (*Ft. Meade*), ECF 4 at 5 (*Naranda*). She is therefore left only with injuries suffered as a "tester"—and that status alone is insufficient to create standing. *See Griffin*,

---

[7] The importance of evaluating standing at the time of filing suit is highlighted by the exhibit attached to Naranda's reply memorandum. ECF 17-1. In a sworn affidavit, a Naranda employee outlines steps that Naranda has taken since the filing of the lawsuit to rectify any issues with ADA compliance. *Id.* To be sure, the affidavit does not establish that Plaintiff's claims have been entirely mooted. Plaintiff testified, however, that she has not re-accessed Naranda's reservations systems since August 21 of this year. *See* Recording of December 1, 2020 H'rg. Once the pandemic permits Plaintiff to plausibly plan an actual trip to Maryland, Naranda's reservation information may be fully ADA compliant, and Plaintiff would have suffered no injury whatsoever from the websites' alleged inaccessibility during a time in which she had no intent to travel.

912 F.3d at 657 (finding no imminent injury where plaintiff's only plausible reason for returning to the alleged violative website was "as a tester, which alone is insufficient"). While hotels are undoubtedly more susceptible to ADA suits from geographically distant plaintiffs than other businesses, the sort of all-encompassing standing doctrine Plaintiff seeks to create here—where an undefined future desire to travel somewhere is sufficient to create an actual or imminent ADA injury centered on room reservations—is foreclosed by *Griffin* and the Supreme Court jurisprudence upon which it relies.

### B. Plaintiff's Lack of Credibility

While the current COVID-19 pandemic and its clear impact on Plaintiff's travel plans is alone sufficient to dismiss *Naranda* and foreclose amendment in *Ft. Meade*, Plaintiff's lack of credibility also counsels against finding standing.

Initially, the Court wishes to make clear that it does not make light of Plaintiff's various disabilities. As the Fourth Circuit eloquently stated in *Griffin*:

> Those who do not suffer from impairments of this nature must be alert and sensitive to the formidable challenges such impairments impose on the navigation of everyday life. We must be sensitive as well to the wealth of talent that, before the passage of the ADA, was locked behind society's unthinking exclusion of people with disabilities. We thus recognize and respect the Americans with Disabilities Act's transformative goal of "the elimination or reduction of physical and social structures that impede people with some present, past, or perceived impairments from contributing, according to their talents, to our Nation's social, economic, and civic life." *Tennessee v. Lane*, 541 U.S. 509, 536, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (Ginsburg, J., concurring).

912 F.3d at 656–57. However, the reality of Plaintiff's difficult circumstances, and the undisputed importance of the ADA's general protections, do not require this Court to turn a blind eye towards the problematic inconsistencies in Plaintiff's testimony and court filings. These contradictions significantly undermine her credibility, such that the Court does not believe her alleged plans to visit Maryland post-COVID are genuine. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)

(holding that a trial court may go beyond allegations of the complaint and hold an evidentiary hearing if it is contended that the jurisdictional allegations of the complaint are not true); *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1014 (8th Cir. 2003) ("If a threshold issue of Article III standing raises material fact disputes, including credibility issues, the district court may conduct an evidentiary hearing and resolve them."); *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 18 (D.C. Cir. 2011) (upholding a district court decision finding no Article III standing based on a credibility determination).

The general crux of Plaintiff's asserted plan is to spend time touring Maryland as part of a road trip of some sort, but the details of that trip have, troublingly, varied significantly throughout her various filings and testimony.  Her proposed complaint against Ft. Meade states that she has "plans to travel North as soon as the Covid travel restrictions are eased" and then describes a trip "from Washington, D.C. through Maryland, Pennsylvania, New Jersey, New York, Connecticut and other states." ECF 17-2 at 5 (*Ft. Meade*).  Her declaration in *Naranda* merely states that she "intend[s] to travel all through [Maryland], including the Baltimore area," and makes no mention of any other states.  ECF 16-1 at 3 (*Naranda*).  At the December 1, 2020 hearing, meanwhile, she only mentioned Maryland, Washington, D.C., and New York as specific places she intended to travel to on her trip.[8]  *See* Recording of December 1, 2020 H'rg (answering in the affirmative when asked if "your plan is to travel from Florida to the Baltimore area and then to continue on to upstate New York").  In a different case before this Court, Plaintiff claims in an amended complaint that she will visit Maryland while "travel[ing] all the way up to Maine," a family trip that she says was

---

[8] Plaintiff also stated several times that she wanted to go "all over the place" and "everywhere." *See* Recording of December 1, 2020 H'rg.  When it comes to establishing the sort of specific and concrete travel plans necessary to show standing, such statements are so broad as to be functionally meaningless.

originally planned for summer of 2020, but now awaits the end of the COVID crisis.  *Laufer v. Prestige Hospitality Group, LLC*, ECF 19-1 at 5, 1:20-cv-02119-SAG.  These shifting descriptions of her itineraries demonstrate that any plans she has are far from concrete, as outlined at length in the preceding section.  Plaintiff has, by her own description, spent significant time "making notes on all the different places I want to go."[9]  *See* Recording of December 1, 2020 H'rg.  She repeatedly emphasized in her testimony how badly she wants to go on this trip.  Yet, with the exception of visiting Maryland, all of the other surrounding details about this allegedly long-in-the-works itinerary are vague and constantly changing.

Plaintiff's specific agenda for her Maryland visit also prompts skepticism.  With the assistance of notes that she claimed to have made during her purportedly extensive travel planning, she listed just five places she wanted to visit—"Light City . . . [the] National Aquarium . . . Inner Harbor, Fells Point, Annapolis"—before moving on to describe her itinerary in upstate New York. *See* Recording of December 1, 2020 H'rg.  With the exception of Annapolis, all of those destinations are in the immediate vicinity of the Inner Harbor in Baltimore, despite the fact that Plaintiff claims to want to travel "all over" the state of Maryland.[10]  While Naranda's property is in close proximity to the Inner Harbor, Ft. Meade's property, the Quality Inn & Suites, is located in Laurel, Maryland, roughly twenty-seven miles from Annapolis and twenty-one miles from

---

[9] Plaintiff said on several occasions while testifying that she has frequent memory loss.  *See* Recording of December 1, 2020 H'rg.  The Court is sympathetic to these issues, and allowed Plaintiff to refer to her notes throughout her testimony.  Memory loss alone, however, cannot account for the inconsistencies in Plaintiff's travel plans, particularly given that the inconsistencies exist in her written pleadings and declarations, not just her on-the-spot oral testimony.

[10] Light City, in fact, is a temporary festival that has been held several times over recent years, but is not presently scheduled to reoccur until 2022.

downtown Baltimore.[11]   It is thus implausible that Plaintiff would stay in Laurel, given her itinerary and the multitude of far more convenient hotels (including Naranda's hotel and others Plaintiff has already sued).

Plaintiff noted that both hotels are located just off of I-95 and are conveniently "on the route" she uses for her trips to New York.  The Court notes, though, that several of Plaintiff's near-identical lawsuits filed in this district are filed against hotels much, much farther afield, undermining both her alleged Baltimore itinerary and her I-95 explanation.  Specifically, Plaintiff sued one hotel in Princess Anne, Maryland, which is roughly 134 miles from Baltimore and 107 miles from Annapolis, and another in Crisfield, Maryland, roughly 155 miles from Baltimore and 126 miles from Annapolis.  *See Laufer v. Vasu Inc.*, ECF 1, 1:20-cv-03264-SAG (Princess Anne, MD); *Laufer v. Hiteshbhai Patel*, ECF 1, 1:20-cv-03265-SAG (Crisfield, MD).  Neither are located anywhere near I-95.[12]

The logistics of Plaintiff's claimed forthcoming trip contain similar discrepancies.  She testified that her daughter will be the driver during the trip.  *See* Recording of December 1, 2020

---

[11] During direct examination, neither Plaintiff nor her counsel appeared to have a good sense of where Laurel, Maryland is located in relation to Baltimore.  Both referred to Laurel as being "about an hour south of [Baltimore]," when in fact Google Maps shows that it is a roughly thirty-minute drive from the Ft. Meade hotel to Baltimore's downtown, traffic depending.

[12] The Court takes judicial notice of the existence of these other cases and the location of the defendant hotels sued in them.  "In the context of a motion to dismiss, '[a] court may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment.'"  *Strickland-Lucas v. Citibank, N.A.*, No. ELH-16-0805, 2017 WL 2876475, at *5 (D. Md. July 6, 2017) (quoting *Brown v. Ocwen Loan Servicing, LLC*, No. PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 Fed. App'x. 200 (4th Cir. 2016)).  The Court gave the parties notice and an opportunity to respond to its intent to take judicial notice of these court records, to which the parties did not respond.  *See* ECF 25 (*Naranda*).  This Court does not take a position on the truth or falsity of any statements made in any other litigation, but simply notes that the existence of a multitude of inconsistent statements undermines the veracity of Plaintiff's filings and testimony in the two cases at issue.

H'rg.  At the same time, however, she also testified that her daughter works full-time, such that Plaintiff is responsible for home schooling her granddaughter.  *Id.*  When asked about how her daughter can drive her on this extensive road trip while working full-time, Plaintiff explained that her daughter does "computer entry stuff . . . so that she can do that [on her laptop] from the car while we travel."  *See* Recording of December 1, 2020 H'rg.  It goes without saying that it is impossible for Plaintiff's daughter to be entering data on her laptop in the car while also driving Plaintiff hundreds of miles up I-95, or to various sightseeing destinations.[13]  *See, e.g., Laufer v. Riddhi BR, LLC*, ECF 12 at 3, 20-cv-300039-KAR ("I also intend to travel throughout the entire state of Massachusetts . . . ."); *Laufer v. 441 Post Road, LLC*, ECF 25-1 at 3, 3:20-cv-00448-VAB ("I will also be traveling all throughout the entire State of New York . . . [and] the entire State of Connecticut."); *Laufer v. Extended State America – Somerset – Franklin*, ECF 9 at 8, 3:20-cv-9193 ("Plaintiff has plans to travel . . . all throughout the state of New Jersey, Somerset, and the surrounding areas.").  Even if one assumes that she meant that her daughter takes days off to drive, or otherwise shifts her schedule before working remotely upon arrival at various destinations, it defies logic to suggest that Plaintiff's daughter could simultaneously work a full-time job—a job demanding enough that Plaintiff says she was needed to step in and homeschool her granddaughter—while also driving Plaintiff on such extensive road trips throughout the country.

Most egregiously, Plaintiff has, under the penalty of perjury, told numerous other district courts across the country the exact same thing she has told this Court: that she plans to travel to *their* respective states "as soon as" the pandemic ends and to travel "all throughout" those states, including places as far afield as Colorado, Illinois, Texas, and Wisconsin.  *E.g., Laufer v. 2500*

---

[13] Like above, the Court takes judicial notice of the sworn declarations Plaintiff submitted in cases in other federal courts, after providing notice to the parties.  *Strickland-Lucas*, 2017 WL 2876475, at *5.

*Arapahoe St LLC*, ECF 20-1 at 3, 1:20-cv-02405-KLM ("I have plans to travel to [Colorado] as soon as the Covid crisis is over and it is safe to travel.  I intend to travel all throughout the State . . . ."); *Laufer v. Q ILL Development, LLC*, ECF 11-1 at 3, 3:20-cv-03149-SEM-TSH ("I have plans to travel to Illinois as soon as the Covid crisis is over and it is safe to travel.  I intend to travel all throughout the State, including travel through the Quincy area along the Mississippi River . . . ."); *Laufer v. U.L.S.T., LLC dba Waterfront Hotel & Marina*, ECF 23-1 at 3, 3:20-cv-50461 ("I have plans to travel to Illinois as soon as the Covid crisis is over and it is safe to travel. I intend to travel all throughout the State, including the areas North of Chicago and the Pistakee/Fox Lake area near Johnsburg . . . ."); *Laufer v. BSJ Laxmi, LLC*, ECF 19-1 at 3, 6:20-cv-389-ADA-JCM ("I have plans to travel to Texas as soon as the Covid crisis is over and it is safe to travel.  I intend to travel all throughout the State, including Dallas and the surrounding towns, including Fairfield . . . ."); *Laufer v. Shree Rajshy Amaji, LLC*, ECF 11 at 3, 3:20-cv-00888-wmc ("I plan to travel to Wisconsin as soon as the Covid crisis abates and travel restrictions are eased.").

In total, Plaintiff has filed at least 557 suits in sixteen different states, plus the District of Columbia.[14]  When her standing to sue has been challenged, she has used virtually identical language in each case to describe her travel plans, changing only the locations she plans to visit to correspond with the location of the defendant hotel.  Inherent in Plaintiff's use of cookie-cutter sworn statements across the country is a core underlying inconsistency: it is impossible for her to actually travel to all of these places "as soon as" the pandemic ends.  Even if one takes a charitable

---

[14] Plaintiff testified that she has filed lawsuits in "every state that I'm thinking of traveling to, around seven."  *See* Recording of December 1, 2020 H'rg.  Seven states is less than half of the true number—she has brought suits in sixteen states and the District of Columbia, and to date has filed declarations of an intent to travel to at least nine of them "as soon as" the COVID pandemic ends.

view of the fluid itineraries in her filings and testimony and assumes that she will travel to a number of northeastern states as well as Maryland, such a tour cannot in good faith be deemed to include states like Colorado, Texas, Wisconsin, and Illinois. The existence of the plethora of contradictory representations renders her testimony about her planned Maryland trip highly dubious.

This Court had already noted in a previous ruling that "[b]ecause Plaintiff is a Florida resident with no apparent history of travel to Maryland, the assertion that she is planning to embark on a comprehensive tour of the entire state as soon as the global pandemic ends is somewhat farfetched." *BRE/ESA P Portfolio*, 2020 WL 6801924, at *3. That conclusion has only been bolstered by her discordant testimony. This Court reaches the inescapable conclusion that Plaintiff's purported future plans to visit Maryland cannot be credited, and thus—even if such plans had been otherwise sufficient to support her standing to sue as of the summer of 2020—no standing exists here.

The conclusion that Plaintiff lacked standing to sue as of the filing of these two lawsuits because she could suffer no concrete, particularized, or imminent injury during the COVID pandemic is likely to affect her numerous other pending cases in this district. While the right to bring these lawsuits is undoubtedly "one of the highest and most essential privileges of citizenship," *Daniels v. Arcade, L.P.*, 477 F. App'x 125, 130 (4th Cir. 2012), it does not serve the interests of justice to continue spending significant Court resources on these cases if Plaintiff lacks standing, lacks credibility, and is not operating in good faith.[15] In fact, Plaintiff's approach to this

---

[15] Importantly, it is not the number of lawsuits Plaintiff has brought that strips her of standing, nor does the number of suits inherently make her claims less plausible. *See Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 457 (4th Cir. 2017) (stating that a plaintiff's litigation history is not grounds for finding a lack of standing); *Daniels v. Arcade, L.P.*, 477 F. App'x 125, 130 (4th Cir. 2012) (rejecting district court's reliance on plaintiff's litigation history to deem his future injury claim implausible). Instead, it is the statements she has made in her filings and testimony that deprive her of standing and credibility here.

ADA litigation appears to prioritize systematic, prolific filings over quality and depth of legal argument, churning out hundreds of near-identical lawsuits using cookie-cutter language irrespective of where the particular hotels are located, or any other party or jurisdiction-specific details. Congress's intent in creating the ADA was to ensure that disabled individuals have equal access to public accommodations, not to facilitate the creation of litigation factories to allow attorneys to reap fees from hundreds of lawsuits while clogging the dockets of the federal courts. With that in mind, the Court warns Plaintiff and her counsel that future filings in her existing Maryland cases, and future lawsuits brought in the same vein while the impediments identified in this opinion persist, will be subject to close review for futility and frivolity, including the possible awarding of attorneys' fees as sanctions.

  For the foregoing reasons, Naranda's motion to dismiss will be granted, and the case will be dismissed with prejudice. While a lack of standing is generally not grounds for dismissal with prejudice since it is a jurisdictional defect, there is an exception for situations in which the defect in question is incurable. *See Graves v. OneWest Bank, FSB*, No. PWG-14-1995, 2015 WL 2452418, at *7 (D. Md. May 20, 2015) (citing *McLean v. United States*, 566 F.3d 391, 400 (4th Cir. 2009)); *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 587 F.3d 1375, 1380 (Fed. Cir. 2009). Here, Plaintiff cannot cure her standing defect. In light of her sworn testimony, it is impossible for her to plead that, when she brought suit against Ft. Meade and Naranda in July and August 2020 respectively, she had the sort of plan to travel to Maryland that would allow her to plausibly allege concrete, particularized, or otherwise imminent injury resulting from Defendants' allegedly ADA-violative room reservation systems. Dismissal with prejudice is therefore appropriate.

## IV.   CONCLUSION

For the reasons set forth above, Defendant Naranda's Motion to Dismiss, ECF 13 (*Naranda*), is granted, and Plaintiff's claims are dismissed with prejudice.  Plaintiff's Motion for Leave to File an Amended Complaint, ECF 12 (*Ft. Meade*), is denied, and the existing dismissal in that case is converted to dismissal with prejudice.  Implementing Orders follow in each case.


Dated:     December 16, 2020                                         /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge